**Michelle MILLAR, and Stephen Koch, Plaintiffs,**

v.

**Iwao OJIMA, in his individual and official capacity, Defendant.**

**No. CV 03–5511(ADS)(ARL).**

United States District Court, E.D. New York.

Jan. 28, 2005.

---

Scott Michael Mishkin, P.C., Islandia, NY (Scott M. Mishkin, of Counsel), for the plaintiffs.

New York State Attorney General's Office, Mineola, NY (Toni E. Logue, Assistant Attorney General, of Counsel), for the defendant.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

Michelle Millar and Stephen Koch (collectively, the "Plaintiffs"), a married couple, bring this action pursuant to 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment to the Constitution. The Plaintiffs also assert a cause of action for "tortuous [stet] interference with their careers" under New York State law. Specifically, the Plaintiffs allege that Iwao Ojima ("Ojima" or the "Defendant") treated them differently as compared with other married couples who were similarly situated as professors at the State University of New York at Stony Brook ("SUNY"). Presently before the Court is a motion by the Defendant to dismiss the complaint pursuant to Rule 12(c) of the Federal Rules of Civil Procedure ("Fed. R. Civ.P.").

## I. BACKGROUND

The following facts and allegations set forth below are taken from the Plaintiffs' complaint and will be viewed in the light most favorable to the plaintiffs, which the Court accepts only for purposes of this motion.

The Plaintiffs, who were married in 1975, are both professors of chemistry at SUNY. As part of their employment, both of the Plaintiffs supervised their own independent research groups consisting of graduate and postgraduate students. During the events that gave rise to this lawsuit, the Chemistry Department at SUNY consisted of two other pairs of chemistry professors who were married to each other, namely Professors Clare Grey and Daniel Raleigh, and Professors Nicole Sampson and Peter Tonge.

In 1997, Ojima became the Chair of the Chemistry Department at SUNY. The Plaintiffs allege that as the Chair of the Chemistry Department, Ojima maintained a custom and practice of treating all professors of Chemistry at SUNY as independent researchers. However, beginning in September of 1997, the Plaintiffs learned that Ojima intended to give Millar's independent research group and Koch's independent research group a collective label known as the "Koch–Millar" group. The Plaintiffs claim that the two other married Chemistry professors did not receive a similar collective label, but instead remained independent of each other.

In October of 1997, Millar complained to the Defendant about the use of the label. In response, the Plaintiffs allege that the Defendant called the characterization a "reality" and that if she was offended, he would change it to "Millar–Koch" as opposed to "Koch–Millar." At this meeting, the Defendant also notified Millar that she would not be given office space for her research group because Koch did not have grant funding. Millar claims that her research group had funding, but since it would now be grouped together with Koch's group it would no longer be entitled

to funding. In response to Millar's complaints about this situation, the Defendant urged Millar to help Koch write his grant application, which Millar refused to do.

During 1998, the Plaintiffs claim that the disparate treatment continued. Millar requested office space for herself and her students in proximity to their laboratories. This request was purportedly denied by the Defendant even though all of the other professors in the Chemistry Department were given an opportunity to have office space near their lab space. In that same year, the Defendant attempted to give Koch a double teaching load, which is customarily only given to retiring professors who are inactive in their scientific research. The Plaintiffs claim that Ojima's decisions were willfully taken with malice and ill will.

On or about January 16, 2002, the Defendant distributed a memorandum to the Chemistry Department notifying them that a room that was being used by Koch's research group was going to be turned into a student lounge. Koch claims that no alternative space was provided for his group. Koch also claims that he was not notified prior to receiving the memorandum and that it was customary for other professors to receive notice of a change in their research space. Koch refused to move from the space, instead he sent out his own memorandum to the faculty of the Chemistry Department explaining his position. In response, the Defendant told Koch's research group the he would call the police on Koch if he did not cooperate. The Defendant also proposed directly to Koch that the matter be resolved by the Provost of SUNY.

As a result of Koch's complaints, the Defendant asked him to attend a meeting of the Space and Planning Committee. The Defendant also asked Millar to attend the meeting. The Plaintiffs contend that no other individuals in the Chemistry Department whose space was not at issue were asked by the Defendant to attend, so Millar declined to attend. At the meeting on February 15, 2002, the Defendant informed Koch that his graduate students in his research group would be put in "bad standing" with SUNY if they did not obey the space change. On February 22, 2002, the committee met again and, instead of discussing Koch's office space, discussed whether Millar should be able to keep her office space. The Plaintiffs allege that these actions emphasized the unequal treatment of referring to their research groups as the "Koch–Millar" group rather than independent groups.

On or about March 8, 2002, a graduate student in Millar's research group received a memorandum from the Defendant instructing her to vacate the group's student office within five days. That same day, the Defendant sent similar notices to Koch's students regarding their office space. The Plaintiffs contend that they were not informed about these vacancy notices until later in the day. On March 11, 2002, in response to the Defendants actions, Millar filed a complaint with the Office of Diversity and Affirmative Action.

On March 13, 2002, members of the Chemistry Department removed all the items from the offices of the Plaintiffs. Following the eviction, Millar began working with her students in office 677. A week later, Millar received a memorandum from the Defendant stating that office 677 was a student office, and if she planned to work there she would have to send a request to the Space and Planning Committee. On March 23, 2002, Millar sent a request to the committee to occupy two smaller offices in exchange for the large office she was evicted from. On April 26, 2002, the Defendant denied Millar's request and imposed a deadline of May 10, 2002, for Millar to vacate the office. Mil-

lar claims that the request was denied in retaliation for the complaint filed with the Office of Diversity and Affirmative Action.

The May 10, 2002 deadline passed without incident and Millar remained in office 677. On September 6, 2002, Millar received a notification from a member of the Executive Committee, headed by the Defendant, stating that Millar was to move out of office 677 by September 13, 2002 and relocate to office 667, which at the time was occupied by Koch's graduate students. Millar refused because Koch was never consulted regarding this arrangement. After consulting with the Office of Diversity and Affirmative Action, it was decided that Millar would move out of her office and go to office 679. Millar was also unhappy with this office because it was adjacent to a graduate student lounge, which would subject her to the offensive odors of cigarette smoke and cooking from students.

On March 19, 2003, Millar commenced the move to office 679. The next day, she was approached by four police officers who informed her that they were looking for "Michelle Millar." Millar contends that the Defendant summoned the officers to ensure that Millar was cooperating with the move.

The Plaintiffs claim that these instances were all examples of disparate treatment that were motivated by the Defendant's personal animosity towards them and that such treatment was arbitrary and wholly irrational. As a result of the alleged disparate treatment, both Millar and Koch claim that they have undergone psychotherapy.

On October 30, 2003 the Plaintiffs commenced this action. In the instant motion, the Defendant moves to dismiss the complaint for, among other things, failure to state a claim under the Equal Protection Clause and New York State law, and based on the Defendant's qualified immunity.

The Plaintiffs opposed the motion and filed an amended complaint, which appears to be precisely the same as the original complaint except for the addition of two statutory authorities in support of jurisdiction. In the Defendant's reply, he correctly notes that the Plaintiffs have improperly attempted to amend their original complaint without leave of Court. However, leave to amend should be freely given in the interests of justice, and thus the Court will allow the Plaintiff's amended complaint to be filed.

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

The standard of review on a motion for judgment on the pleadings under Rule 12(c) is whether "the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Serv., Inc. v. Int'l Union, United Plant Guard Workers of Am.,* 47 F.3d 14, 16 (2d Cir.1995). This standard is the same as that applicable to a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6). *Nat'l Ass'n of Pharm. Mfrs. v. Ayerst Lab.,* 850 F.2d 904, 909 n. 2 (2d Cir.1988). A court may grant a Rule 12(b)(6) motion to dismiss for failure to state a claim only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Phillip v. University of Rochester,* 316 F.3d 291, 293 (2d Cir.2003) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *Kaltman–Glasel v. Dooley,* 156 F.Supp.2d 225, 226 (D.Conn. 2001).

The function of the Court is not to weigh the evidence that may be presented at trial but instead the Court must determine if the claims are legally sufficient. *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir. 1985); *see also King v. Simpson,* 189 F.3d 284, 287 (2d Cir.1999). The Court must

construe all reasonable inferences in favor of the plaintiff and accept the allegations contained in the claims as true. *See Desiderio v. National Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 202 (2d Cir.1999). Therefore, a court must evaluate whether the allegations in the complaint can sustain a cause of action under applicable law, and should grant the motion to dismiss only if the plaintiffs can prove no set of facts in support of their claims that would entitle them to relief. *See Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002); *King v. Simpson*, 189 F.3d 284, 286 (2d Cir.1999). The issue is not whether the plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support the claims. *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.1995).

## B. AS TO THE SECTION 1983 CLAIM

Actions may be brought pursuant to 42 U.S.C. § 1983 against state actors to enforce rights created by federal statutes and the Constitution. *Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S.Ct. 2502, 2502, 65 L.Ed.2d 555 (1980). In order to bring a claim under section 1983, a plaintiff must allege that (1) the defendant was acting "under color of state law" at the time the conduct complained of occurred, and (2) that the conduct deprived the plaintiff of " 'rights, privileges or immunities secured by the Constitution or laws of the United States.' " *Greenwich Citizens Comm., Inc. v. Counties of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26, 29–30 (2d Cir.1996) (quoting *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981)); *see also Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743–744 (2d Cir. 2003).

### 1. Under Color of State Law

An individual acts under color of state law when he or she exercises power " 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' " *Polk County v. Dodson*, 454 U.S. 312, 317–18, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)); *see also West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Generally, " 'state employment is . . . sufficient to render the defendant a state actor.' " *West*, 487 U.S. at 49, 108 S.Ct. 2250 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 n. 18, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)).

The Second Circuit has held that "a professor employed at a state university is a state actor." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 744 (2d Cir.2003). In *Hayut*, the Second Circuit reasoned that "[a] professor at a state university is vested with a great deal of authority over his students with respect to grades and academic advancement by virtue of that position." *Id.* Likewise in this case, the Defendant was not only a professor employed by a state university, but he was the head of the Chemistry Department, which vested him with the authority to make decisions that could affect the other professors in the department. As such, Professor Ojima's position as a Chairman of the Chemistry Department at SUNY Stony Brook satisfies the requirement that the defendant exercised powers under color of state law.

### 2. Equal Protection

In order to seek redress through section 1983, "a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*." *Blessing v. Freestone*, 520 U.S. 329, 340, 117 S.Ct. 1353, 1359, 137 L.Ed.2d 569 (1997). The Fourteenth Amendment of the United States Constitution guarantees that no state shall

"deny to any person within its jurisdiction the equal protection of the laws." This is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). The Plaintiffs in this case claim that they were treated differently than the other professors in the Chemistry Department who were similarly situated.

█ Discriminatory treatment by government officials is sufficient to trigger assessment under the Equal Protection Clause. *See Lewis v. Thompson,* 252 F.3d 567, 590 (2d Cir.2001). If government action interferes with a "fundamental right" or discriminates against a "suspect class," it must be reviewed using the strict scrutiny analysis. Absent these circumstances, government action will ordinarily survive an equal protection challenge so long as the action is rationally related to a legitimate governmental purpose. *Plyler v. Doe,* 457 U.S. 202, 216–17, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). When government action discriminates against an individual for reasons other than an association with a class, the plaintiff is commonly referred to as a "class of one," rather than a "suspect class."

Here, Millar and Koch do not allege that they are members of a suspect class or that the Defendant's actions interfered with a fundamental right. Rather, the Plaintiffs allege two distinct, yet similar, "class of one" equal protection arguments. The Plaintiffs claim that the Defendant treated them differently than other professors who were similarly situated in the Chemistry Department at SUNY either because of personal animus or due to actions that were wholly arbitrary and irrational. These theories of equal protection originate from *LeClair v. Saunders,* 627 F.2d 606, 609–10 (2d Cir.1980), and *Village of Willowbrook v. Olech,* 528 U.S. 562, 564,

120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000), respectively. Both claims allege that a state actor employs "selective enforcement" of a regulation or law against a "class of one." *Id.; see also Bizzarro v. Miranda,* 394 F.3d 82, 85 (2d Cir.2005); *African Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 362 (2d Cir.2002).

### a. Personal Animus

█ As previously stated by the Second Circuit, a claim of disparate treatment based on personal animus lies "in a murky corner of equal protection law in which there are surprisingly few cases and no clearly delineated rules to apply." *Le Clair v. Saunders,* 627 F.2d 606, 608 (2d Cir.1980). In order to bring such a claim, a plaintiff must plead both that "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Le Clair,* 627 F.2d at 609–10.

"Class of one" claims typically arise in the context of cases involving enforcement of zoning regulations when an individual is denied a permit while other individuals who are similarly situated are granted that benefit. *See, e.g., Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 499–500, 502–03 (2d Cir.2001); *Crowley v. Courville,* 76 F.3d 47, 52–53 (2d Cir.1996); *Zahra v. Town of Southold,* 48 F.3d 674, 684 (2d Cir.1995). "Class of one" claims also arise in the context of employment actions where state actors are accused of selective enforcement of disciplinary rules. *See, e.g., Cobb v. Pozzi,* 363 F.3d 89, 110 (2d Cir.2004); *Giordano v. City of New York,* 274 F.3d 740, 751 (2d Cir.2001). In both instances, a plaintiff must plead a "mali-

cious or bad faith intent to injure." *Bizzarro*, 394 F.3d at 87.

In a case similar to the instant action, a part-time teacher alleged that the school board selectively applied district hiring policies when they terminated her employment due to her marriage to the superintendent of the school. *Payne v. Huntington Union Free Sch. Dist.*, 219 F.Supp.2d 273, 274 (E.D.N.Y.2002). The *Payne* court, in ruling on a motion for summary judgment, dismissed the plaintiff's equal protection claim because there was no evidence that the board intentionally treated the plaintiff differently then the other teachers who were similarly situated. *Id.*, at 281–82.

▮ In this case the plaintiffs list a litany of instances in which they were allegedly treated differently than other professors in the Chemistry department. All of these instances relate to two types of actions: (1) that they were treated collectively as a married couple instead of independent research-professors; and (2) that they were unfairly treated with regard to office assignments. The Plaintiffs adequately allege that other married professors in the same department were treated independently and that the other professors were notified and consulted about potential changes in office space. Indeed, in a class of one claim "there is no requirement in the Second Circuit that the Plaintiffs 'identify in [their] complaint actual instances' where others have been treated differently." *The Cathedral Church of the Intercessor v. Vill. of Malverne*, No. 02–2989, 2005 WL 150805, \*5, 2005 U.S. Dist LEXIS 946, at \*15 (E.D.N.Y.2005); (quoting *DeMuria v. Hawkes*, 328 F.3d 704, 707 (2d Cir.2003) (permitting a "class of one" claim to survive a motion to dismiss where the complaint only generally alleged that other individuals were treated differently)).

In addition, the Plaintiffs adequately allege that the disparate treatment was motivated by the Defendant's personal vendetta against them due to the fact that they were married to each other. The Defendant argues that alleging a personal vendetta is insufficient to sustain a claim. However, the Second Circuit has stated that "[t]he branch of equal protection law that protects individuals from unequal treatment motivated by 'malicious or bad faith intent to injure' provides protection from adverse governmental action that is not motivated by 'legitimate governmental objectives.'" *Bizzarro*, 394 F.3d at 87 (quoting *Esmail v. Macrane*, 53 F.3d 176, 180 (7th Cir.1995)). In construing all reasonable inferences in favor of the Plaintiffs and accepting the allegations in the complaint as true, the Court finds that the Plaintiffs have stated a selective enforcement claim based on personal animus.

**b. Irrational Basis**

A claim of selective enforcement may also be brought by a "class of one" where a similarly situated individual is treated differently by a state official who acts in an irrational and wholly arbitrary manner. *Olech*, 528 U.S. 562, 565, 120 S.Ct. 1073 (2000). In *Olech*, the Supreme Court permitted a claim of selective enforcement to survive against a village that denied the plaintiff's zoning request. In so doing, the Supreme Court stated that allegations of irrational and wholly arbitrary conduct "are sufficient to state a claim for relief under traditional equal protection analysis" notwithstanding the "subjective intent" of the defendant. *Id.*

▮ "To prevail under Olech, on which they rely heavily, [the P]laintiffs need to allege that they were 'intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *African*

*Trade,* 294 F.3d at 364 (quoting *Olech,* 528 U.S. at 564, 120 S.Ct. 1073). Here, the Plaintiffs' complaint states that "Defendant intentionally treated plaintiffs differently than other faculty members, and this conduct was done in an irrational and wholly arbitrary manner based on defendant's ill will towards Millar and Koch." The Plaintiffs support this allegation with examples of the Defendant's actions that show, albeit barely, disparate treatment that might be irrational and wholly arbitrary. The Court's function at this stage is not to evaluate or weigh the evidence, but to view the complaint in the light most favorable to the Plaintiffs. As such, the Court finds that the allegations in the complaint, by themselves, appear to be sufficient to state a "class of one" equal protection claim under *Olech* for irrational and wholly arbitrary disparate treatment.

### C. *QUALIFIED IMMUNITY*

 A defendant that presents a qualified immunity defense in a 12(c) motion faces a "formidable hurdle." *McKenna v. Wright,* 386 F.3d 432, 434 (2d Cir. 2004). The motion may be granted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489, 1494 (2d Cir.1992). In analyzing whether a public official is entitled to qualified immunity, the Court looks at whether the conduct complained of violated " 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Catletti v. Rampe,* 334 F.3d 225, 228 (2d Cir.2003) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "A right is considered to be 'clearly established' if '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Danahy v. Buscaglia,* 134 F.3d 1185, 1190 (2d Cir.

1998) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

 With these considerations in mind, case law has clearly established the "class of one" selective enforcement claim alleged in this action. *See Verbeek v. Teller,* 158 F.Supp.2d 267, 283–84 (E.D.N.Y.2001); *see, e.g., Olech,* 528 U.S. 562, 565, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000); *LaTrieste Restaurant & Cabaret, Inc. v. Village of Port Chester,* 40 F.3d 587, 590 (2d Cir. 1994) (recognizing equal protection claim based on selective enforcement). Under the facts presented in the complaint, the Court cannot say as a matter of law that the Defendant could not have understood that it would be wrong to maliciously or irrationally treat the Plaintiffs differently than the other professors in the Chemistry Department. Therefore, at this stage of the litigation, the Defendant is not entitled to qualified immunity.

### D. *TORTIOUS INTERFERENCE CLAIM*

 The Plaintiff allege a cause of action for "tortuous [stet] interference with their careers under New York law." From the cases that the Plaintiffs cite in their opposition to the Defendant's motion to dismiss, *e.g., Cohen v. Davis,* 926 F.Supp. 399, 403 (S.D.N.Y.1996), it appears that their claim is actually one for tortious interference with contract. Under New York law, the elements of a tortious interference with contract claim are "(a) that a valid contract exists; (b) that a third party had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." *Finley v. Giacobbe,* 79 F.3d 1285, 1294 (2d Cir.1996) (citing *Israel v. Wood Dolson Co.,* 1 N.Y.2d 116, 120, 134 N.E.2d 97, 99–100, 151 N.Y.S.2d 1, 5

(1956); *Kaminski v. United Parcel Serv.*, 120 A.D.2d 409, 412, 501 N.Y.S.2d 871, 873 (1st Dep't 1986)).

 A claim for tortious interference can only be made where there is a contractual relationship. *Snyder v. Sony Music Entertainment, Inc.* 252 A.D.2d 294, 299, 684 N.Y.S.2d 235 (1st Dep't 1999). In order to state a claim, the plaintiff is required to "identify a specific contractual term that was breached." *See Risley v. Rubin*, 272 A.D.2d 198, 199, 708 N.Y.S.2d 377, 378 (1st Dep't.2000). Here, the Plaintiffs have failed to allege what contract, if any, was interfered with. The Plaintiffs allege that they were hired as professors at SUNY and that the "Defendant acted with intent to cause harm to plaintiffs' careers in carrying out his personal vendetta." In addition, the Plaintiffs allege that "[t]his vendetta caused defendant to treat plaintiffs in a disparate manner in the terms and conditions of their employment." However, the Court notes that the complaint is silent as to what type of contractual relationship or agreement existed between the Plaintiffs and SUNY.

 Without a specific allegation to the contrary, the Court will assume that the Plaintiffs were at-will employees of SUNY. Generally, employment contracts that are terminable at will cannot give rise to a cause of action for tortious interference with a contract. *Cohen*, 926 F.Supp. at 403. In *Risley*, the court dismissed a claim that was very similar to the one brought in this case. *Riley* involved a professor's allegations of tortious interference with a contract and tortious interference with career advancement against the chair of his department. The court stated that in order to state a claim, a putative plaintiff must "demonstrate that he would have received some prospective economic advantage 'but for' [the] interference." *Id.*

 A cause of action for tortious interference with prospective economic advantage requires a plaintiff to demonstrate that "the defendant's interference with its prospective business relations was accomplished by 'wrongful means' or that defendant acted for the sole purpose of harming the plaintiff." *Snyder v. Sony Music Entertainment, Inc.*, 252 A.D.2d 294, 300, 684 N.Y.S.2d 235 (1st Dep't 1999). Examples of "wrongful means" or harm include acts "such as fraud, misrepresentation, or threats." *Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir.2001) (quoting *Cohen*, 926 F.Supp. at 403).

 In this case the Plaintiffs have failed to show how their careers have been economically damaged. The complaint merely alleges that the Defendant's conduct, which primarily consisted of reassignment of offices, caused the Plaintiffs to be treated differently, and that this disparate treatment led to embarrassment and psychotherapy. These allegations are insufficient to state a tortious interference with prospective economic advantage claim under New York law. Moreover, the Defendant's conduct, as alleged in the complaint, does not include acts that rise to the level of fraud, misrepresentation, or threats.

### III. *CONCLUSION*

Based on the foregoing, it is hereby

**ORDERED,** that the Defendant's motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(c) is hereby **DENIED,** in part, as to the Plaintiffs equal protection claims; and it is further

**ORDERED,** that the Defendant's motion to dismiss is **GRANTED,** in part, as to the Plaintiffs "tortuous [stet] interference with careers" claims; and it is further

**ORDERED,** that all parties are directed to appear for jury selection in Courtroom 1020, Long Island Federal Courthouse,

Central Islip, New York on Monday, March 14, 2005 at 9:00 a.m.

**SO ORDERED**